UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHRISTINE I. O'NEILL, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> MERRICK B. GARLAND, *et al.*, <br><br> Defendants. | Civil Action No. 21-1288 (JEB) |

### MEMORANDUM OPINION

In 2015, Congress established the United States Victims of State Sponsored Terrorism Fund, which draws largely from sanctions penalties to compensate those who have obtained judgments against foreign countries for acts of state-sponsored terrorism. Plaintiffs are 9/11-related claimants, who, for the count that remains in this case, became eligible to draw payments from the Fund only in the third round of distributions. They bring this proposed class action under the Administrative Procedure Act to challenge the method for calculating payments devised by the Special Master of the Fund. Such method, they believe, unlawfully penalizes those who did not participate in the first two rounds. Plaintiffs therefore ask this Court to mandate additional payments to similarly situated third-round claimants. Government Defendants not surprisingly object, and they now move to dismiss for lack of jurisdiction or, in the alternative, for summary judgment.

The Court ultimately agrees with the Government that it is powerless to entertain the merits of Plaintiffs' claim. Congress expressly and broadly precluded judicial review of decisions by the Special Master with regard to compensation from the Fund. As this lawsuit at

1

bottom challenges such decisions, it falls squarely within that preclusion provision. The Court, accordingly, will dismiss this action for lack of subject-matter jurisdiction.

## I. Background

### A. Statutory Background

Under the Foreign Sovereign Immunities Act, courts can order state sponsors of terrorism to pay damages to their victims. See 28 U.S.C. § 1605A. Congress has facilitated victims' ability to collect these damages in multiple ways, including by setting up the United States Victims of State Sponsored Terrorism Fund in 2015. See Compensation for United States Victims of State Sponsored Terrorism Act, Pub. L. No. 114-113, § 404, 129 Stat. 2242, 3007 (2015). Our legislature has subsequently amended the Terrorism Act twice — first in 2019 and then in 2020 — with ramifications for the Fund that are discussed below. See United States Victims of State Sponsored Terrorism Fund Clarification Act, Pub. L. No. 116-69, § 1701, 133 Stat. 1134, 1140–43 (2019); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 1705, 134 Stat. 1182, 3292 (2020).

When setting up the program in 2015, Congress initially appropriated $1.025 billion to the Fund. See Pub. L. No. 114-113, § 404(e)(5). It then directed that future funding come from certain forfeiture proceeds, penalties, and fines from federal civil and criminal matters involving state sponsors of terrorism. Id. § 404(e)(2). Of those funding streams, all of the proceeds of qualifying criminal cases and 75% of the proceeds from qualifying civil penalties (initially 50% before Congress increased the percentage in the 2019 Clarification Act) are deposited into the Fund. Id.; Pub. L. No. 116-69, § 1701(b)(1)(C)(ii).

To "administer the compensation program," Congress directed the Attorney General to appoint a Special Master. See 34 U.S.C. § 20144(b)(1)(A). The Special Master is charged with

soliciting claims, determining which are eligible, and dispensing compensation in accordance with the Terrorism Act's prescriptions.  See ECF No. 26 (MTD) at 5.  More specifically, the statute mandates that she first cap claims at $20 million, see 34 U.S.C. § 20144(d)(3)(A)(ii)(I), then divide all available funds among the claimants "on a pro rata basis, based on the amounts outstanding and unpaid on eligible claims."  Id. § 20144(d)(3)(A)(i)(I), (III).  As for timing, the Terrorism Act contemplated the Special Master's authorizing a first round of payments within a year of December 18, 2015, a second round less than two years thereafter, and subsequent rounds annually, so long as money remained available.  See Pub. L. No. 114-113, §§ 20144(d)(2)–(4).  As of this writing, there have been three such distributions, with the Special Master expected to authorize round-four payments on eligible claims by January 1, 2023.  See U.S. Victims of State Sponsored Terrorism Fund, http://www.usvsst.com [https://perma.cc/LKF8-PPZ4].

Among those eligible for payments from the Fund are individuals with a final district-court judgment holding a designated state sponsor of terrorism liable for damages from an injury arising from torture, extrajudicial killing, aircraft sabotage, hostage taking, or providing material support for these actions.  See 34 U.S.C. § 20144(c), (j).  For the first four years of the Fund's existence, 9/11-related claimants who had participated in the separate 9/11 Victims Compensation Fund were excluded from receiving payments.  See Pub. L. No. 114-113, § 404(d)(3)(ii).  Congress later removed that limitation in the 2019 Clarification Act, opening the door for otherwise eligible claimants who had participated in the 9/11 VCF to bring claims to the Fund.  As a result, for third-round and future distributions, the Clarification Act requires that the Fund divide the total amount of available funds evenly between 9/11-related claimants (including VCF award recipients) and non-9/11-related claimants (including other judgment holders and Iran hostage-crisis victims and their families).  See Pub. L. No. 116-69, § 1701(b)(1)(C)(i)

(codified at 34 U.S.C. § 20144(d)(3)(A)(i)(I)). Within each of these two pools of claimants, the Fund would continue to distribute awards *pro rata*. See 34 U.S.C. § 20144(d)(3)(A)(i)(II), (III).

B. Procedural Background

Plaintiffs are 9/11-related claimants who bring this proposed class action on behalf of all such claimants, including those who received payments in the first and second distributions as well as those who, due to their prior participation in the 9/11 VCF, were eligible to receive payments beginning only with the third distribution. See ECF No. 1 (Compl.), ¶¶ 26–33. As explained below, given the dismissal of one cause of action, the only claim that survives concerns this latter group of Plaintiffs. See id., ¶ 27. They principally contend that the Special Master violated the Terrorism Act by establishing a payment methodology — reflected in a written explanation that is made available to claimants in connection with each round of payments — that improperly results in underpayments to 9/11-related claimants newly eligible to draw from the Fund in the third round. See U.S. Victims of State Sponsored Terrorism Fund, Payment Information, http://www.usvsst.com/payment.php [https://perma.cc/P5VA-A9H2]. This error, Plaintiffs argue, stemmed from the Special Master's calculating payments from the Fund in each of the first three rounds based on the full amount of all eligible judgments each claimant had previously obtained, "even if those judgments had already received partial payments from the [Fund] in prior years." Compl., ¶¶ 71–72. The result is that new claimants to the Fund have to take smaller bites from a pie that has already been nibbled at by return claimants. Plaintiffs argue that this approach contravenes the Terrorism Act's requirement that the Special Master make her *pro rata* payment calculations based on the "amounts outstanding and unpaid on eligible claims." 34 U.S.C. § 20144(d)(3)(A)(i)(II), (III). They thus ask the Court

4

to mandate a different formula for future distributions, which would include reimbursing them for the prior errors. See ECF No. 28 (Pl. Cross-MSJ) at 27.

The Government responds that the Special Master's method for calculating payments is based on a reasonable interpretation of the Terrorism Act, see MTD at 27–32, and that, regardless, Congress expressly precluded judicial review of "all decisions made by the Special Master with regard to compensation from the Fund." Id. at 16 (first citing 34 U.S.C. § 20144(b)(3); and then citing Justice for United States Victims of State Sponsored Terrorism Act, 81 Fed. Reg. 45,535, 45,536, Part IV (July 14, 2016) ("The Special Master will . . . calculate payment amounts in accordance with the Act," and her determinations "are final and not reviewable by any court.") (Fund Procedures)).  The Government, accordingly, moves to dismiss or, in the alternative, for summary judgment, and Plaintiffs respond by cross-moving for summary judgment.

## II.    Legal Standard

Because none of Defendants' dispositive arguments turns on evidence outside of the four corners of the Complaint, the Court will apply only the standard for a motion to dismiss at this stage.  In evaluating such a motion, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citation omitted); see also Jerome Stevens Pharms., Inc. v. Food & Drug Admin., 402 F.3d 1249, 1253 (D.C. Cir. 2005).

Federal Rule of Civil Procedure 12(b)(1) permits dismissal of a complaint for lack of jurisdiction.  In general, courts must first address jurisdictional arguments before turning to the merits.  See Sinochem Int'l Co. v. Malaysia Int'l Shipping Co., 549 U.S. 422, 430–31 (2007).  A

plaintiff bears the burden of proving that the Court has subject-matter jurisdiction to hear her claims.  See Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).  A court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." Grand Lodge of the Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  For this reason, "'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." Id. at 13–14 (quoting 5A Charles A. Wright & Arthur R. Miller, Fed. Practice & Procedure § 1350 (2d ed. 1987)).  Additionally, unlike with a motion to dismiss under Rule 12(b)(6), the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." Jerome Stevens Pharms., Inc., 402 F.3d at 1253; see also Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992).

### III.   Analysis

Plaintiffs initially raised two challenges to the Special Master's administration of the Fund, but the parties have since agreed that the first of those — regarding the retroactivity of the Clarification Act's increase in the percentage of civil penalties deposited in the Fund — should now be dismissed given that the D.C. Circuit recently rejected that reading of the Terrorism Act. See Braun v. United States, 31 F.4th 793 (D.C. Cir. 2022); ECF No. 24 (Joint Status Report of June 17, 2022) at 1.  The only remaining claim, therefore, is Plaintiffs' challenge to the Special Master's methodology for calculating *pro rata* payments on applicants' eligible claims from the Fund.  The Court need not reach the merits of this cause of action, however, because it finds that its inquiry begins and ends with the question of its jurisdiction.

The Terrorism Act provides that "[a]ll decisions made by the Special Master with regard to compensation from the Fund" are "not subject to administrative or judicial review." 34 U.S.C. § 20144(b)(3). The question here is whether the Act forbids review of Plaintiffs' sweeping challenge to the *pro rata* payment calculations.

The last time this Court confronted this provision of the Terrorism Act, it noted that "[n]o court has previously ruled on whether (and to what extent) the statute permits judicial review." Braun v. United States, 531 F. Supp. 3d 130, 135 (D.D.C. 2021). Although the Federal Circuit has now addressed the preclusion question in the context of a challenge arising out of the denial of an individual claim, see Hekmati v. United States, 51 F.4th 1066 (Fed. Cir. 2022) (holding such challenge precluded), it remains the case that no court has decided the issue of whether (and to what extent) challenges aimed at decisions about the Fund's precise payment methodology are permissible under the statute. This Court in Braun observed that these preclusion questions raise "taxing [issues] to resolve" and therefore chose to assume (without deciding) statutory jurisdiction and deny the challenge on the merits, leaving the jurisdictional question to another day. See 531 F. Supp. 3d at 135. Tomorrow has now arrived, and the Court must confront the question of jurisdiction over this challenge head on. Although the issue is reasonably close, the Court believes that the statute removes jurisdiction over Plaintiffs' suit.

As a general matter, there is a "strong presumption that Congress intends judicial review of administrative action." Bowen v. Mich. Acad. of Fam. Physicians, 476 U.S. 667, 670 (1986). That presumption can be rebutted, however, with "clear and convincing evidence" of a legislative intent to "restrict access to judicial review." Abbott Lab'ys v. Gardner, 387 U.S. 136, 141 (1967). When Congress withholds review of administrative action, it withdraws the court's jurisdiction to hear claims challenging the agency's conduct. See Mercy Hosp., Inc. v. Azar, 891

F.3d 1062, 1071 (D.C. Cir. 2018); see also 5 U.S.C. § 701(a)(1) (withdrawing APA's statutory grant of jurisdiction to extent statute "preclude[s] judicial review"). "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." Block v. Cmty. Nutrition Inst., 467 U.S. 340, 345 (1984) (citation omitted). The Court now looks separately at these principal considerations.

A. Statutory Text and Structure

As it must, the Court begins with the plain language of the statute. The relevant provision of the Terrorism Act, entitled "Decisions of the Special Master," reads:

> All decisions made by the Special Master with regard to compensation from the Fund shall be—
> (A) in writing and provided to the Attorney General, each claimant and, if applicable, the attorney for each claimant; and
> (B) final and, except as provided in paragraph (4), not subject to administrative or judicial review.

34 U.S.C. § 20144(b)(3). The only exception to the finality of the Special Master's decisions is found in the next paragraph, which sets out an alternative administrative-review scheme.

The key textual question is whether the Special Master's payment methodology as set out in her explanation of payments is a "decision[] made by the Special Master with regard to compensation from the Fund." The Court concludes that it is. To begin, under the plain text of the statute, the explanation of payments is a "decision" that the Special Master made "with regard to compensation." That document details, *inter alia*, the *pro rata* percentage that each claimant would receive based on the total amount of funds available for distribution and how the Special Master will account for payments from other sources. See U.S. Victims of State Sponsored Terrorism Fund, Payment Information. Each of these is a decision that comes within

the Special Master's purview as a result of her authority to "order payment from the Fund for each eligible claim." 34 U.S.C. § 20144(d)(1).

A brief review of the Special Master's role and administrative duties in their statutory context also supports the view that her payment-calculation decisions fall within the scope of the statute's judicial-review bar. See K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of the statute, the court must look to . . . the language and design of the statute as a whole."). Charged with the duty to "administer the compensation program described in this section," 34 U.S.C. § 20144(b)(1)(A)(iii), the Special Master dispenses payments according to the eligibility criteria, allocation methodology, and timelines specifically articulated by the statute. Id. § 20144(c)–(d); see Special Master, Report Regarding the Third Distribution, U.S. Victims of State Sponsored Terrorism Fund at 9 (June 2020), https://bit.ly/3V13diG [https://perma.cc/CM4Y-2PAL]. She thus serves an administrative function with regard to claims: she determines, for example, whether an individual is statutorily eligible, which of his claims qualify for recovery, whether he has provided adequate supporting documentation, and how much he is qualified to receive in each distribution round. See Fund Procedures at 45536–38.

The Special Master's duty to "administer the compensation program," however, extends beyond decisions about particular claims. Within her obligation to "order payment from the Fund for each eligible claim," 34 U.S.C. § 20144(d)(1), also inhere a number of broader non-claim-specific decisions, such as considering available funds, establishing payment procedures, and detailing a payment methodology for each distribution. Payment methodologies are set out in writing and made available to claimants in connection with each round of payment distributions. See U.S. Victims of State Sponsored Terrorism Fund, Payment Information. The

9

Special Master is also responsible for devising "the procedures necessary for United States persons to apply and establish eligibility for payment." Id. § 20144(b)(2)(A). Finally, she is required to issue a report to Congress within 30 days of authorizing payments on claims, which must include an "explanation of the procedures for filing and processing of applications for compensation" and an "analysis of the payments . . . from the Fund and the amount of outstanding eligible claims." Id. § 20144(i). The statute, therefore, gives the Special Master significant latitude in making "consequential determinations" that govern the Fund and its operations, including generating the precise mathematical formulae required to make payments, subject to oversight by Congress. Braun, 531 F. Supp. 3d at 135.

       The placement of the provision precluding judicial review also support the conclusion that these decisions of the Special Master are unreviewable. That provision is entitled "Decisions of the Special Master" and is located in the larger subsection entitled "Administration of the Fund." Congress could well have alternatively placed this provision in the subsections entitled "Eligible claims" or "Payments" had it wished to circumscribe the Special Master's review to individual adjudications. It did not. The Court need not venture further in deciding the outer limit of the Special Master's decisions that lie beyond judicial review. For our purposes, it is sufficient to conclude that, given the placement of that provision and the expansive language it employs, payment and eligibility determinations — as well as all decisions regarding the methodology for calculating payments made by the Special Master — are withheld from judicial review. Cf. Schneider v. Feinberg, 345 F.3d 135, 145 (2d Cir. 2003) (concluding that Congress "confided each [9/11 VCF] award [determination] to the sealed box of a Special Master's mind, has refrained from meaningful prescriptions, and has placed the result beyond the reach of review").

10

Plaintiffs nevertheless urge a narrower definition of the word "decisions" as used in this subsection, arguing that it encompasses only the "adjudication of . . . <u>particular</u> claim[s] or case[s]." Cross-MSJ at 34 (citing Webster's New Collegiate Dictionary II (2d ed. 2005)). In particular, they cite subparagraph (b)(3)(B), which requires that the relevant decisions of the Special Master be "in writing and provided to the Attorney General, <u>each claimant</u>[,] and, if applicable, the attorney for <u>each claimant</u>," Cross-MSJ at 33, as evidence that the word "decisions" was meant to encompass only adjudications of individual claims. Although the Court acknowledges the appeal of this reasoning, it notes that such a narrow reading of the word "decisions" fixates on subparagraph (b)(3)(B) at the expense of the larger statutory structure and scope of the Special Master's authorities with regard to ordering compensation. Should every decision of the Special Master regarding compensation from the Fund that does not directly result in an individual adjudication of a particular claim become reviewable, then Congress's judicial-review bar would be significantly undermined.

Plaintiffs also rely in part on this Court's earlier decision in <u>Braun</u>. While the Court there observed that the language in paragraph (b)(3), when viewed in conjunction with the opportunity to request a hearing before the Special Master for reconsideration of particular claims, "makes clear that challenges to . . . individual determinations regarding eligibility and entitlement are barred," 531 F. Supp. 3d at 135, it reserved judgment on the question of whether a statutory challenge about retroactivity of the Clarification Act as a whole would be reviewable. <u>Id.</u> at 136. Plaintiffs thus believe that their suit falls on the programmatic side of the line and is thus reviewable. Yet they read too much into <u>Braun</u>, which itself expressed skepticism that "objections to distributions" would be reviewable and never decided the full scope of "decisions" that were withheld from judicial review. <u>Id.</u> at 136.

B.  Relief Sought

The relief Plaintiffs seek further reveals that, regardless of their framing of this challenge as being aimed at a "broad programmatic determination" of the Special Master, see Cross-MSJ at 33–34, at bottom this case concerns her compensation decisions for 9/11-related claimants.  As the Government correctly points out, when the text of a statute precludes judicial review, the Court must look beyond Plaintiffs' characterization of their challenge and view their claim through the perspective of the relief sought.  See ECF No. 30 (Def. Opp.) at 10 (citing Heckler v. Ringer, 466 U.S. 602, 614 (1984), and Schneider, 345 F.3d at 145, 148-49); cf. Hudson v. Am. Fed. of Gov't Emps., No. 22-289, 2022 WL 16551322, at *6 (D.D.C. Oct. 31, 2022) ("[C]ourts must consider claims through the perspective of the requested relief" when assessing preclusion issues).

The Supreme Court endorsed such an approach in Heckler v. Ringer, 466 U.S. 602.  That case involved Medicare claimants who sought reimbursement for a type of surgical procedure known as BCBR.  The Secretary of Health and Human Services had complicated their quest for reimbursement by issuing an "administrative instruction" and a "formal administrative ruling" that BCBR was not reimbursable under Medicare.  Id. at 607–08.  Respondents thus brought a series of constitutional and statutory challenges to those two actions, including objections to the procedures by which the Secretary issued her decisions.  Id. at 610, 614.  The question for the Court was whether respondents were required to first channel those challenges through the Medicare Act's review provisions.  That Act imposed certain administrative-exhaustion requirements on "claims arising under" it.  Id. at 605.  Judicial review was available to a claimant "only after the Secretary render[ed] a 'final decision' on [a] claim" for reimbursement.  Id.  And

12

a final decision "is rendered . . . only after the individual claimant has pressed his claim through all designated levels of administrative review." Id. at 606.

The claimants in Heckler had not satisfied that exhaustion prerequisite when they brought their suit. Id. at 611–12. Instead of seeking individual reimbursement of their claims, they had jumped straight to challenging the Secretary's broader declarations. They contended (and had successfully persuaded the Court of Appeals) that this was permissible, though, because they were "seeking to invalidate the Secretary's procedure for determining entitlement to benefits." Id. at 612 (emphasis added). The Supreme Court, however, rejected that characterization of their claim, explaining that "it makes no sense to construe" respondents' challenges "as anything more than, at bottom, a claim that they should be paid for their BCBR surgery." Id. at 614.

So, too, Heckler's logic applies here. Approaching Plaintiffs' challenge to the Special Master's payment-calculation formula through the perspective of the relief they seek, we can see that this case boils down to a dispute over the appropriate amount of compensation from the Fund. Regardless of Plaintiffs' insistence that they take aim at a "broad programmatic determination" on behalf of a "large class of claimants," the end result and the relief they seek is the same as if a single 9/11 claimant had raised this issue with respect to her particular claim: to draw more money from the Fund. See Cross-MSJ at 33–34. This is precisely the type of dispute that this Court in Braun was skeptical could be reviewable. See 531 F. Supp. 3d at 136 (noting that "objections to distributions" from Fund were likely precluded from judicial review). To allow Plaintiffs to evade the bar on judicial review merely by bringing their claims together and characterizing their challenge as programmatic would risk undoing the administrative-review process Congress designed.

C. <u>Objectives and Purpose of Fund</u>

Finally, the Government's reading of the Terrorism Act's judicial-review bar is also consistent with congressional intent, the objectives of the Fund, and the nature of the administrative action challenged here. Inserting judicial review into the wide-ranging and technical decisions of the Special Master regarding the calculation of payments "would severely disrupt [the Fund's] complex and delicate administrative scheme" for expeditiously allocating payments to claimants, potentially creating unreasonable delays and litigation in conjunction with every distribution round. See <u>Block</u>, 467 U.S. at 348; <u>see also</u> MTD at 26. Congress's manifest intent was that the Fund operate to compensate victims of state-sponsored terrorism efficiently and quickly, and it then set expeditious deadlines for standing up the Fund's operations, and it exempted the Fund's procedural rules from lengthy notice-and-comment rulemaking. <u>See</u> 24 U.S.C. § 20144(b)(1)(A), (2)(A); <u>see also</u> <u>NLRB v. United Food & Com. Workers Union, Local 23, AFL-CIO</u>, 484 U.S. 112, 130–33 (1987) (warning that permitting judicial review could undermine statutory scheme by allowing for "lengthy judicial proceedings in precisely the area where Congress was convinced that speed of resolution is most necessary").

Far from leaving Plaintiffs with no recourse to air their grievances about the Fund's payment methodology, the Terrorism Act contemplates that Congress will directly oversee the Special Master and her operation of the Fund including payments. The statute requires that she make a report to Congress in conjunction with each round of payment authorizations, specifying the procedures and processes claimants must follow in applying for compensation and an analysis of the payments made from the Fund. <u>See</u> 34 U.S.C. § 20144(i) (requiring regular reports be delivered to "chairman and ranking minority member of the Committee on the Judiciary of the House of Representatives and the chairman and ranking minority member of the

Committee on the Judiciary of the Senate"). Additionally, Congress directed the Comptroller General of the United States to "conduct an audit and publish in the Federal Register a notice of proposed lump sum catch-up payments to 9/11 victims, 9/11 spouses, and 9/11 dependents" with claims before the Fund, indicating an ongoing willingness to explore new ways to compensate 9/11-related claimants from the Fund.

Since the Fund's inception in 2015, Congress has in fact been responsive to concerns about inequities in payments. It has amended the Fund's enabling statute to include previously ineligible 9/11-related claimants, see Clarification Act, Pub. L. No. 116-69, to extend the life of the Fund, see Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, and to investigate the potential cost of catch-up payments for 9/11-related claimants. Id. There is no reason to believe that if Congress disagreed with the Special Master's methodology for issuing payments that it would not once again step in to modify the Fund's payment regime.

### IV.     Conclusion

For the foregoing reasons, the Court will grant the Motion to Dismiss for lack of subject-matter jurisdiction. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: December 5, 2022